**WEBER et al. v. WITTMER CO. et al.**
No. 1991.

District Court, W. D. New York.
March 9, 1938.

Andrews, Andrews & McBride, of Syracuse, N. Y. (Harold McBride, of Syracuse, N. Y., of counsel), for plaintiffs.

Floyd W. Annabel, of Bath, N. Y., for defendants.

BURKE, District Judge.

This is a suit in equity wherein the plaintiffs seek to have declared fraudulent and void a certain lease covering oil and gas rights. They ask rescission of the lease and an accounting for the value of the gas removed from the property. The plaintiff Louis Weber in 1930 was in possession of a farm in the Town of Greenwood, Steuben County, which he had purchased under a land contract. The legal title to the farm was held by the plaintiffs Lester S. Rice and May Rice. On or about July 8, 1930 the plaintiffs executed an instrument in writing wherein they granted to Wittmer Oil and Gas Properties of Pittsburg, Pa., for a term of 10 years and so long thereafter as gas or oil was produced, the exclusive right to drill for, produce and remove petroleum and natural gas. By its terms the Wittmer Oil and Gas Properties agreed to deliver to the plaintiffs in pipe lines one-eighth of the petroleum produced and if gas was found and marketed to pay therefor at the rate of $200 per year for the product of each well while the same was being used and marketed or made into gasoline or other products. The lease was to be null and void if operations for a well were not commenced within twelve months unless the lessee should pay at the rate of $11.88 quarterly until operations were commenced. The plaintiffs reserved 200,000 cubic feet of gas per annum for domestic purposes and agreed to pay for any excess over this amount at domestic rates. The lease was subsequently assigned to the Wittmer Company, a corporation, one of the defendants. On March 2, 1933 a large producing gas well came in on the Weber farm. Efforts were thereafter made to modify the lease to a one-eighth royalty for gas. Failing in that, this suit was brought.

The lease was procured by one John Reichle who was employed by the Wittmer Oil and Gas Properties for the purpose of taking leases for drilling operations. Plaintiffs contend that the lease was obtained by fraud and misrepresentation. The alleged fraud is based upon the claim that Reichle represented to the plaintiffs:

(1) That Wittmer Oil and Gas properties was not interested in gas, but only in oil, and for that reason that the provision of paying for gas at the rate of $200 per well per year did not matter.

(2) That $200 per well per year was all that the Wittmer Oil and Gas properties were paying anywhere for gas and that all of the leases of the Wittmer Gas & Oil Properties were taken on a basis of $200 per year per well for gas.

(3) That the provision of $200 per year per gas well would equal a royalty of one-eighth of the gas produced and saved from such a well as might be discovered.

The evidence tending to support plaintiffs' claim of fraud is not convincing. Plaintiffs knew that the lease covered the gas rights as well as the oil rights. The lease was on a printed form and in large type at the top of the lease were the words "Oil and Gas Lease". The plaintiffs knew that the lease provided a flat sum of $200 per year per well for gas. Louis Weber, Bessie Weber and Lester E. Rice discussed this particular provision of the lease with Reichle. The Webers contend, however, that they were deceived because Reichle said that his company was not interested in gas but only in oil. They could not close their eyes, however, to the terms of the lease which contained a stipulated sum for the gas rights, and a reservation of gas for domestic consumption. These provi-

sions are evidence of the lessee's interest in gas as well as oil and would be meaningless unless the lessees were interested in gas as well as oil. In the face of these provisions they will not be heard to say that they were deceived by representations, even if made, that the lessee was not interested in gas but only in oil. The evidence leaves no room for doubt that they clearly understood that they were to receive a flat yearly sum of $200 for each gas well. Whether this provision mattered or not depended upon the result of the lessee's operations and their attendant success. Neither Reichle nor anyone connected with the lessees could forecast that. Plaintiffs' contention of fraud embraces the theory that deep gas had been tapped in the Oriskany sands in the Dundee field, that large producing wells had been brought in, and that the known geological data showed that the Oriskany structure ran in a general south-west direction across New York State and generally in the location of plaintiffs' farm. No such knowledge, however, had come to Reichle at the time the lease was executed. A geological map containing this information and prepared by the State of New York was published in May of 1930. There is no evidence, however, that the information contained in that publication relating to the trend and direction of the Oriskany structure and its proximity to plaintiffs' farm was known to Reichle or to any one connected with the lessees at the time the lease was executed. Even though it may be said, however, to have been common knowledge among persons familiar with oil and gas operations, Reichle made no representations regarding any of such structures or their location or trend or the proximity of plaintiffs' premises thereto, nor was he bound to disclose such information to plaintiffs even if it were in his possession. Regardless of known geological data relative to the location of the Oriskany sands, the locality surrounding plaintiffs' farm was unproven territory. Neither gas nor oil had been discovered there in paying quantities. The Dundee field, where deep gas wells had been brought in, was approximately 40 miles away. To hold that successful drilling operations could be even reasonably expected in 1930 upon lands in the general location of the Oriskany sands in Greenwood Township would be to accord geological data more importance than the experts who testified gave it and more than common experience would require. The most that could be said of the territory when the lease was executed would be that it was, as one of the plaintiffs' experts called it, "a likely place for early exploration". Indeed the activities of agents securing leases throughout the locality at that time was evidence of that fact. But none could say whether oil or gas or either would be found. Perhaps they may have expected gas with more assurance than oil with the knowledge of the Dundee success fresh in their minds, but that was far from knowledge that gas would be found. Nor was it a disclaimer of an interest in oil. Liederbach, called as an expert by plaintiffs, testified as follows: "Q. Well at that time, in July 1930, could you with any reasonable accuracy, could you as an experienced gas and oil man, with any reasonable accuracy, predict whether you would strike oil or gas in the Greenwood field? A. No, there was a possibility you could get either gas or oil." He further testified, "Q. Was it or was it not probable that oil would be discovered there? A. Yes it was". The presence of either gas or oil in paying quantities on the Weber farm in 1930 when the lease was made was still in the realm of speculation.

■ As to the alleged representation that $200 per year per gas well would equal one-eighth, that was entirely dependent upon the size of the well in case gas was found. It matters not whether gas was expected at a shallow depth or in the Oriskany sands. Reichle had no knowledge of what was to be encountered, whether oil or gas, and most certainly not the size or flow of any well not yet located or drilled. Such a representation, if made, was nothing more than the expression of an opinion. It was in the nature of a prediction of the size of a well not yet located or drilled.

Weber, his wife, and Rice, all said that they discussed the question with Reichle at the time the lease was executed, as to why one-eighth was paid for oil and not for gas. That was their real concern and not whether $200 was a fair flat price annually for a gas well. The complaint alleged as a basis for fraud that the plaintiffs had been deceived because Reichle knew when he made the alleged representations that his company had been making leases for gas in the same and surrounding territory on a one-eighth royalty basis. The

proof adduced by plaintiffs does not sustain this allegation of fraud. The only proof as to leases containing one-eighth royalty for gas was limited to two instances where modifications of existing leases were procured and these modifications were made in 1931, both more than a year after the Weber lease had been signed. Weber and his wife were not in agreement as to Reichle's statement about the amount that was being paid. Mr. Weber testified that Reichle said that "their leases were all drawn the same and that the $200 was all he ever gave anybody * * *". No proof was adduced that Reichle ever leased for more than $200 for gas rights. Mrs. Weber said, "that $200 was all they were paying anywhere". It is true that a number of leases had been procured by the Wittmer Oil and Gas Properties which provided $300 per year per gas well, and, in certain contingencies, one-eighth of the market value of the gas, but none of these was procured by Reichle and none of them was in Greenwood Township. Are we to infer that the concern of the Webers was what was being paid for leases in their own locality or in some other locality where conditions may have been entirely different and where the land was in closer proximity to producing wells? Mrs. Weber testified, "He showed us the lease on one of the neighbors farms and said they were signing up as shown to us and we said if that was all they were paying anyone that we would sign". What seemed to interest the Webers was the amount that was being paid for leases to their neighbors and not to persons in some other locality.

In 1931 the Wittmer Company started drilling operations on land adjoining the Weber farm. This well was drilled to a depth of about 1500 feet by the use of a small drilling machine. This rig was not large enough to reach the deep Oriskany sands. Plaintiffs' whole contention of fraud is based upon the fact that the Wittmer Gas and Oil Properties were primarily interested in reaching deep gas in the Oriskany sands and that in procuring the lease they led plaintiffs to believe otherwise, but the first two wells that the Wittmer. Company drilled in Steuben County were drilled for shallow wells to the Richfield sand at a depth of about 1500 feet. The Warriner well adjoining the plaintiffs' property was one of these wells. When the Richfield sands had been reached in the Warriner well and neither oil nor gas discovered, the Wittmer Company brought in a standard rig and the well was drilled to Oriskany sand at 4200 feet. The well was completed in September ' 1932 and proved to be a gas well. Louis Weber was working for the drilling contractor when this well came in.

Plaintiffs' contention is that they did not discover the alleged fraud until March 2, 1933, when the Weber well was completed and came in gas, but Weber had sufficient indication at least when the Warriner well was completed to put him upon inquiry as to whether or not the Wittmer Company was after gas and not oil. He saw the Warriner well come in and knew that it was a gas well. Mrs. Weber knew that it was a gas well. It was only a quarter of a mile away from where the well was later drilled on Weber's farm. He said he was getting a little suspicious when the Warriner well came in and proved to be a gas well, but in spite of this suspicion he made no inquiries of anyone connected with the Wittmer Company as to what they were after on his farm. On the contrary, he even assisted the representatives of the Wittmer Company in fixing the location of the well to be drilled on his farm. He made no objection to their entry upon his land and although drilling for the well was in progress upon his land from December 1932 to March 1933, he made no inquiries from the drillers as to what they were after, although he himself worked from time to time for the Wittmer Company in the drilling operations upon his own well. His suspicion having been aroused as to the alleged fraud, it was his duty to inquire as to the basis of it. If he had inquired it would seem that in view of all the circumstances he would have had no difficulty in determining that the Wittmer Company was after gas upon his farm. He stood by, however, and allowed them to incur large expense for drilling operations with not a word of complaint until long after the well had been completed and the gas marketed.

On January 26, 1933, during the progress of the drilling operations upon the Weber farm, the plaintiffs agreed in writing to sell an undivided one-half interest in their oil and gas rights to E. C. Bogart. This agreement provided that a consideration of $1,000 would be paid to the grantors within twenty days after the oil and gas lease on the premises had been modified to a one-eighth royalty or a royalty of one and one-half cent per thousand cubic feet of gas. On March 16, 1933,

about two weeks after the Weber well had been completed and had come in as a large producing well, the plaintiffs entered into another agreement in writing with Bogart wherein they sold to him an undivided half interest in their oil and gas rights subject to the terms of the lease and a consideration of $1,000 was paid. All of the plaintiffs were parties to these two instruments. It is incomprehensible that the plaintiffs were not aware that the Wittmer Company was after gas when the first agreement above referred to was signed. The main consideration was to be paid only after a modification of the gas royalties had been obtained. Even at the time of the execution of this agreement Weber was talking of rescission of the lease. Certainly at this time when modification and rescission were being considered, plaintiffs must have known of the alleged fraud or at least have had good ground for suspicion, but still they allowed the operations to continue without a word of complaint.

According to his own testimony, Louis Weber knew about leases in Steuben County for more than $200 about six months before the Weber well came in. This would have placed the time in September 1932 which was several months before drilling operations upon the Weber well started but with that knowledge, there was not a word of complaint that leases had been made with others for more than $200 until long after the Weber well was completed. This course of conduct upon the part of the plaintiffs was inconsistent with an intention of avoiding the lease and must be held to have the effect of an election to affirm.

■ Equity will countenance no delay in exercising the right to rescind after knowledge of the fraud upon which the right to rescind is based. It will not permit time to discover by the happening of events whether it is more advantageous to affirm or disaffirm. When suspicion is aroused, what might reasonably be gained by inquiry is the equivalent of knowledge. Brite v. Howey Co., 5 Cir., 81 F.2d 840. Upon discovery of the fraud the party defrauded may elect to rescind, or to affirm and resort to a suit for damages. If he chooses to rescind he must do so promptly, make known his position, and must not thereafter waver from it. Failure to promptly rescind amounts to an affirmance. Brite v. Howey, Co., supra, and authorities there collated.

■■ In the case at bar there was no act that amounted to a notice of disaffirmance until the action was brought in June, 1935, more than two years after the Weber well was completed, and after the well had ceased to produce gas in commercial quantities. Bogart and his associate, Liederbach, who had purchased part of Bogart's interest, during 1933 and 1934 were negotiating with the Wittmer Company in an attempt to have the lease modified to provide a one-eighth royalty for gas. They were acting for the plaintiffs. These negotiations, however, were based upon Weber's dissatisfaction with his lease because gas was being produced in large quantities and because other companies had modified leases under similar circumstances. But Weber was dissatisfied after the Warriner well came in, before he knew of the fraud according to his contention. Nowhere in the negotiations was there an unequivocal charge of fraud in the procurement of the lease nor a notice that the plaintiffs elected to disaffirm. There was a threat of suit but for all that appears in the negotiations, this threat might have been based upon the contention that the consideration for the lease was insufficient and unconscionable because of the amount of gas produced.

The evidence is insufficient to establish fraud and misrepresentation in the making of the lease, but even if fraud were established the plaintiffs must be held to have lost the right to rescind and to have elected to affirm the lease. The defendants are entitled to a decree dismissing the bill of complaint.

■ Both plaintiffs and defendants have submitted findings and conclusions which I have marked. These, together with the statements and conclusions in this opinion will serve to answer the requirement of Equity Rule 70½, 28 U.S.C.A. following section 723.